**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF MASSACHUSETTS**

**EASTERN DIVISION**

| | |
|---|---|
| In re<br><br>**MITCHELL J. SORBERA,**<br><br>Debtor | **Chapter 7**<br>**Case No. 10-19944** |
| **JEAN MORRISSETTE,**<br><br>                    Plaintiff<br><br>v.<br><br>**MITCHELL J. SORBERA,**<br><br>                    Defendant | **Adversary Proceeding**<br>**No. 10-01356** |

<u>**MEMORANDUM OF DECISION**</u>

**I. Overview**

By his complaint in this adversary proceeding, plaintiff Jean Morrissette ("Morrissette") seeks a

determination that his state-court judgment against the defendant-debtor, Mitchell J. Sorbera

("Sorbera") is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as a debt arising from actual fraud,

or alternatively, under 11 U.S.C. § 523(a)(4) as a debt arising from defalcations while acting in a fiduciary

capacity.  In essence, Morrissette argues that Sorbera surreptitiously withdrew funds from the accounts

of two companies that the parties owned together and converted those funds to his own use.

Morrissette obtained a default judgment against Sorbera in Florida for breach of fiduciary duty, which

Sorbera is seeking to discharge in bankruptcy.  After a two-day trial, the Court now makes the following

findings and rulings and, on the basis thereof, concludes that Morrissette has not established cause to

except his state-court judgment from discharge under Chapter 7 of the Bankruptcy Code.

**II. Findings of Fact and Procedural History**

This is a case about a car salesman and an electrical contractor who decided to put their thirty-year friendship to the test by going into the business of importing boats from Canada and selling them in New England.  In 2003, these intrepid entrepreneurs formed Retro Marine Inc. ("Retro Marine"), a Massachusetts corporation, as a vehicle for carrying out their plan.  Sorbera and Morrissette were the sole officers, directors, and stockholders of the corporation.  Rather than establishing equity stakes in Retro Marine, Morrissette and Sorbera capitalized the company through a series of personal loans that they expected would be repaid over time.  Over the course of Retro Marine's business operations, Sorbera loaned $120,000 to Retro Marine, while Morrissette loaned the company $35,000.  Retro Marine's business plan was to use a "show piece" boat to attract customers, whereupon the company would order customized boats from a Canadian company ("Southwest Fiberglass") and Sorbera would drive to Canada, pick them up, and deliver them directly to the customers.  Morrissette, who owned an electrical contracting business in Florida, played a more limited role, the nature of which is unclear.

Initially, Retro Marine showed signs of success, prompting Sorbera and Morrissette to expand operations.  In 2004, the parties purchased a small business in Oak Hill, Florida that sold small boats and offered boat repair and maintenance services.  Sorbera provided the down payment of $27,000, with the remainder of the purchase price financed by the sellers and secured by a mortgage on the underlying real estate.  The parties then formed two Florida companies, Fish World of Oak Hill, Inc. ("Fish World"), which operated the business, and Oakwood Lake, LLC ("Oakwood"), which held the real estate.  Once again, the parties capitalized the operating company through a series of personal loans: Sorbera loaned $155,170, while Morrissette loaned $57,000.

The parties viewed Fish World as not only an opportunity to branch out into new products and regions, but also as a way to cut costs at Retro Marine by bringing boats there for customization.  Although the parties offer conflicting accounts of their division of labor at Fish World, they agree that

Sorbera was expected to continue fulfilling his responsibilities at Retro Marine: meeting with customers, attending boat shows, driving to Canada to pick up boats, hauling the boats back to Fish World, customizing the boats at Fish World, and then delivering the boats to various locations along the eastern seaboard and as far inland as Michigan. In addition, Morrissette claims that Sorbera was also to be responsible for running day-to-day operations at Fish World. Conversely, Sorbera contends that the agreement was for Morrissette to be primarily responsible for Fish World. Given Sorbera's other responsibilities and Morrissette's close proximity to Fish World, I find Sorbera's testimony more persuasive on this point. Clearly, however, Morrissette did not take the reins, forcing Sorbera to attempt to straddle both companies. Ultimately, Fish World was forced to hire managers, who apparently began stealing from the company and selling products "out the back door" for personal profit.

In addition to starting Fish World, Morrissette and Sorbera began investing in real estate. The parties formed another Florida entity, Retro Development, LLC ("Retro Development"), which they used to purchase and hold a parcel of Florida real estate near Fish World. Sorbera loaned $4500 to this venture, while Morrissette loaned $108,000. Subsequently, Morrissette and Sorbera purchased an additional Florida property, Angelea Road, for which Sorbera provided the down payment of $20,000. To recap, the total contributions via loan to the parties' joint endeavors were $326,670 for Sorbera and $200,000 for Morrissette. Neither party took a salary, but by informal agreement, each party was permitted to withdraw funds as necessary to (i) operate the companies and real estate and (ii) repay themselves for their loans and expenses. Morrissette's testimony regarding Sorbera's expenses was particularly instructive as to the nature of this agreement: "I don't recall having a discussion but . . . I had no problem with it. I, I accepted that as a legitimate business expense if someone's not taking a salary, that, you know, the expenses need to be paid."[1]

---

[1] *Tr. Day 1*, at *167*.

The lack of a definitive plan and the subsequent practices employed by the parties proved to be the downfall of their business relationship.  As Sorbera was driving up and down the east coast marketing and delivering boats, he incurred considerable expenses and reimbursed himself by writing checks from company bank accounts to cash or to his personal bank accounts.  Morrissette, too, reimbursed himself by drawing on the company coffers.  In fact, he sold the Retro Development property and kept the net proceeds of $49,000, which he used to satisfy personal obligations.

In January of 2006, Morrissette unilaterally obtained a second mortgage on the Oakwood property, without Sorbera's consent, by representing to the bank that he had authority to do so as the managing partner.  Morrissette took $125,000 from the deal and used it in his electrical contracting business.  At the same time, Sorbera had been attempting to find additional financing for Oakwood, which had fallen behind on its mortgage payments as a result of Fish World's recent cash flow problems.  However, when Sorbera found a willing lender, he also found that Morrissette had already encumbered the property.  Sorbera sent a letter to the second-mortgagee bank explaining that the transaction was unauthorized and demanding that mortgage be released.  The bank capitulated and moved the mortgage to Morrissette's personal property, but it was too late to prevent the first mortgagee from initiating foreclosure proceedings.  At this point, Morrissette again took action without consulting Sorbera by filing a Chapter 11 bankruptcy case on behalf of Oakwood, and in doing so stayed the foreclosure.  Sorbera disagreed with this course of action and was ultimately able to obtain the Oakwood property's release for the foreclosure to proceed.

In the wake of Morrissette's actions with respect to the second mortgage and bankruptcy, Sorbera lost faith in Morrissette as a business partner and began to act accordingly.  In late 2006 and throughout 2007, he began withdrawing funds from Retro Marine and Fish World and depositing them into new a bank account (the "SW Retro Account").  These funds were not withdrawn for Sorbera's personal use.  Rather, Sorbera continued to operate Retro Marine, but did so from the SW Retro

Account; he continued to pay Fish World's debts, but again, did so from the new bank accounts; and finally, he also continued to write himself checks in repayment of his loans.

In July of 2007, Sorbera filed a lawsuit in a Florida court against Morrissette, the nature of which related to Morrissette's procurement of the second mortgage on Oakwood. During the course of discovery, Morrissette learned of Sorbera's numerous withdrawals from Fish World and Retro Marine. In response, Morrissette filed a counterclaim for breach of fiduciary duty. Due to a scheduling error, Sorbera was in Canada, to pick up a boat, on the day of trial. As a result, Sorbera's complaint was dismissed, and Morrissette received a default judgment for $190,743 on his counterclaim. During the trial of the present adversary proceeding, however, it became clear that the amount of the state-court judgment was the result of a substantial mathematical miscalculation in Morrissette's favor. In the state court proceeding, Morrissette averred that he made a contribution of $155,760 to Fish World. In this adversary proceeding, Morrissette acknowledged that, in fact, it was Sorbera who contributed this amount. As previously noted, Morrissette's actual contribution to Fish World was $57,000—a difference of $98,760. While this finding in no way impacts the validity of the state-court judgment, the portion of the debt that resulted from the acknowledged error cannot be deemed to have arisen from the circumstances that form the basis of Morrissette's claims under 11 U.S.C. § 523(a)(2) and (a)(4).

Following the state-court judgment, Sorbera pursued an appeal and continued to pay the debts of Fish World and Retro Marine, but he operated Retro Marine's business under the auspices of a new company formed by his brother ("Retro Marine Southwest"). In 2010, after Sorbera's appeal proved unsuccessful, he filed for relief under Chapter 7 of the Bankruptcy Code, listing Morrissette's judgment on Schedule F as an unsecured nonpriority claim. In due course, Sorbera received a discharge under Chapter 7.[2]

---

[2] Sorbera testified and I find that he used the SW Retro Account funds for repaying loans he had made to the company; making floor plan principal and interest payments; entering boat shows; purchasing and outfitting boats; paying insurance on boats; and covering travel expenses related to boat sales, including gasoline, tolls, and hotel

Morrissette timely initiated the present adversary proceeding, seeking to establish his claim as a nondischargeable debt arising from actual fraud under 11 U.S.C. § 523(a)(2)(A) or from defalcations while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4).  The complaint alleges that Sorbera breached his fiduciary duty to Morrissette by improperly withdrawing company funds, converting them to his own use, and concealing them in personal bank accounts.  Morrissette does not rely on the state-court judgment for issue preclusion in the present adversary proceeding.  A two-day trial was held, following which I took the matter under advisement.

## III. Discussion

### A.   Actual Fraud

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud."  11 U.S.C. § 523(a)(2)(A).  The party seeking the determination of nondischargeability bears the burden of establishing by a preponderance of the evidence that the particular debt falls within § 523(a)(2)(A) and therefore should be excepted from discharge.  *Grogan v. Garner*, 498 U.S. 279, 291 (1995).  "Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's 'fresh start' policy . . . ."  *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 1 F.3d 7, 9 (1st Cir. 1994)).  In order to establish that a debt is nondischargeable under § 523(a)(2)(A) due to "false pretenses, a false representation, or actual fraud," the plaintiff must prove each of the following elements by a preponderance of the evidence:

> (1) the debtor made a false representation either knowingly or with reckless disregard for the truth;

---

bills. *Tr. Day 2*, at 52-57. The checks introduced into evidence by Morrissette were consistent with Sorbera's testimony.  For example, see Check #1208 to Southwest Fiberglass for $5000;  Check #1236 to Drewco Services for $9000; Check #1252 to U.S. Yacht Shows for $1775; and Check #1299 to M. Sorbera, Memo: Repay Loan—$500 11-19-08. *Plaintiff's Exh. 7.*

(2) the debtor intended to deceive;
(3) the debtor intended to induce the creditor to rely upon the false statement;
(4) the creditor actually relied upon the misrepresentation;
(5) the creditor's reliance was justifiable; and
(6) the reliance upon the false statement caused damage (pecuniary loss).

*McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001); *Palmacci*, 121 F.3d at 786.

The present case involves allegations not of false representations or false pretenses but of actual fraud.  In *Spigel*, the First Circuit noted that the six-element test it outlined in that case has been subject to criticism in other circuits for conflating "actual fraud" with "false representations"—that is, for unduly limiting actual fraud to false representations.  *In re Spigel*, 260 F.3d at 32 n.7.  Most notably, in *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000), the Seventh Circuit held that fraud is a broader concept, "which embraces all the multifarious means which human ingenuity can devise and . . . includes surprise, trick, cunning, dissembling, and any unfair way in which another is cheated." *Id.* at 893 (quoting *Stapleton v. Holt*, 250 P.2d 451, 453-54 (Okla. 1952)).  To date, the First Circuit has taken no position on the validity of *McClellan*'s broad reading of actual fraud under § 523(a)(2)(A).  *See In re Spigel*, 260 F.3d at 32 n.7 (noting that the court was not resolving the issue raised by *McClellan*).  In *Blacksmith Investments, LLC v. Woodford (In re Woodford)*, 403 B.R. 177, 187-89 (Bankr. D. Mass. 2009), however, Judge Feeney held that *McClellan*'s reading of actual fraud was inconsistent with the Supreme Court's interpretation of that term and, accordingly, limited it to the definition provided by the First Circuit in *Spigel*.

Judge Feeney gave two compelling reasons supporting this conclusion.  First, in *Field v. Mans*, the Supreme Court explained that actual fraud under § 523(a)(2)(A) carries the common law elements of fraudulent misrepresentation found in the Restatement (Second) of Torts (1976).  *In re Woodford*, 403 B.R. at 187-89; *see Field v. Mans*, 516 U.S. 59, 70 (1995).  Second, the bankruptcy court is "bound by the elements comprising the common law formulation of 'actual fraud' enunciated by the [First Circuit] in

*Spigel*," which include evidence of a misrepresentation. *In re Spigel*, 403 B.R. at 188*.* I agree that for these two reasons, actual fraud under § 523(a)(2)(A) is limited to the standard set forth in *Spigel*.

Because the *Spigel* standard governs, Morrissette must present evidence of a misrepresentation. *In re Spigel*, 260 F.3d at 32. This he has failed to do. Morrissette does not suggest that Sorbera incurred the debt by making false statements. Moreover, although there was a failure to disclose withdrawals,[3] such failure was not alleged to have constituted a misrepresentation. I also note that Morrissette has not offered even a scintilla of evidence or argument that Sorbera ever intended to induce reliance or that Morrissette ever actually relied on a misrepresentation made by Sorbera. Allegations of unauthorized and concealed withdrawals—unhinged from the standard set forth in *Spigel*—do not state a claim for nondischargeability under § 523(a)(2)(A). *See Delisle v. Staniunas (In re Delisle)*, No. 01-4391-JBR, 2003 WL 26085842, at *6 (B.A.P. 1st Cir. June 9, 2003). Accordingly, I find that Morrissette has not carried his burden of proving actual fraud by a preponderance of the evidence.

### B.   *Defalcation While Acting in a Fiduciary Capacity*

Morrissette next argues that his claim is excepted from discharge under § 523(a)(4) as a debt arising from defalcations while acting in fiduciary capacity. "The burden of proof to establish defalcation is on the creditor, given the 'fresh start' policy." *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 17 (1st Cir. 2002). "The creditor must show defalcation by a preponderance of the evidence." *Id.* "The exception to discharge applies to fiduciaries only while they are acting in a fiduciary capacity." *Id.* "Inherent in 'defalcation' is the requirement that there be a breach of fiduciary duty; if there is no breach, there is no defalcation." *Id.* "In order to avoid redundancy, defalcation must mean something other than fraud and different from 'willful and malicious injury.'" *Id.* "Defalcation is to be measured objectively." *Id.*

---

[3] A misrepresentation under § 523(a)(2)(A) can take the form of an omission, a "failure to disclose information that one is bound to reveal," but only when the omission itself amounts to a representation. *See Drake Capital Securities, Inc. v. Larkin (In re Larkin)*, 189 B.R. 234, 239 (Bankr. D. Mass. 1995).

Federal law determines whether a fiduciary relationship exists under § 523(a)(4). The "broad definition of fiduciary under nonbankruptcy law—a relationship involving trust, confidence, and good faith—is inapplicable in the nondischargeability context." *Raso v. Fahey (In re Fahey)*, No. 11-01118-WCH, 2012 WL 5861746, at *7 (B.A.P. 1st Cir. 2012) (quoting *Honkanen v. Hopper (In re Honkanen)*, 446 B.R. 373, 378-79 (B.A.P. 9th Cir. 2011)). Under federal law, a fiduciary relationship arises by virtue of an express or technical trust. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934); *In re Baylis*, 313 F.3d at 17 n.3. "The elements of an express trust have traditionally included an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust relationship." *In re Fahey*, 2012 WL 5861746, at *6 (quoting *Gehlhausen v. Olinger (In re Olinger)*, 160 B.R. 1004, 1014 (Bankr. S.D. Ind. 1993)). "A technical trust is one that arises under statute or common law." *Petrucelli v. D'Abrosca (In re D'Abrosca)*, No. 09-01070-ANV, 2011 WL 4592338, at *5 (B.A.P. 1st Cir. Aug. 10, 2011). Additionally, in the context of closely held corporations, some courts within this circuit have suggested that a fiduciary relationship "could be established by the existence of a contract and substantial ascendency of one shareholder over another as an alternative to an express or technical trust." *E.g., Farley v. Romano (in re Romano)*, 353 B.R. 738, 762-63 (Bankr. D. Mass. 2006).

Morrissette offers no argument that the parties' relationship created an express or technical trust, nor does he argue that the alternative standard set forth in *Romano* is applicable. Rather, he suggests that a defalcation may be presumed from Sorbera's alleged breach of fiduciary duty as determined under Massachusetts and Florida law. Although Morrissette clearly misapprehends the relevant standard for determining the existence of a fiduciary relationship under § 523(a)(4), I need not reach that issue. Even assuming, *arguendo*, that Sorbera did hold the funds at issue in the necessary fiduciary capacity, Morrissette has not carried his burden of proving a defalcation by a preponderance of the evidence.

Defalcation is a slippery concept and is not defined in the Bankruptcy Code.  "Inherent in

'defalcation' is the requirement that there be a breach of fiduciary duty," although not all breaches

amount to defalcations.  *In re Baylis*, 313 F.3d at 17-18.  In *Baylis*, the First Circuit explained that while a

breach of the duty of loyalty comes within the ambit of defalcation, the mental state required "comes

close to a showing of extreme recklessness." *Id.* at 20.  Ultimately, in order to establish that the alleged

debt in this case arose from one or more defalcations, Morrissette "must be able to show that

[Sorbera's] actions were so egregious that they come close to the level that would be required to prove

fraud, embezzlement, or larceny." *Id.*

Morrissette argues that all of Sorbera's withdrawals after the parties' falling-out constituted

self-dealing, which, if true, would be a breach of the duty of loyalty and raise a presumption of

defalcation.  *Id.*  At trial, however, Sorbera explained that his withdrawals of funds fell into four

categories of expenditures that related to the business operations of Retro Marine and Fish World: (i)

payment of Retro Marine's operating expenses; (ii) payment of Fish World's debts; (iii) reimbursement

of expenses incurred in operating Retro Marine; and (iv) repayment of personal loans made to the

companies.

I find that the checks entered into evidence demonstrate that a significant portion of the

moneys were withdrawn and expended for the ordinary business purposes identified in categories (i)

and (ii).[4]  Having been used for business expenses, these withdrawals did not constitute self-dealing or a

breach of the duty of loyalty and consequently did not amount to defalcations.  *See id.* (describing the

duty of loyalty as "the duty not to act in the fiduciary's own interest whenever his personal interest

---

[4] Morrissette attempted to rebut the legitimacy of these expenses by providing evidence that prior to the
withdrawals, Retro Marine had been dissolved and Fish World had begun winding up its affairs. Be that as it may,
the checks plainly demonstrate that Sorbera was continuing to operate Retro Marine and pay Fish World's debts.
For instance, with respect to Retro Marine, Sorbera sent checks to "Providence Boat Show," "U.S. Yacht Shows,"
"Pickering Wharf Marina," and most significantly and substantially, "Southwest Fiberglass," Retro Marine's boat
supplier. *See Plaintiff's Exhs. 7, 12, 16*. With respect to Fish World, Sorbera sent numerous checks to "Drewco
Services," Fish World's floor-plan creditor. *See Plaintiff's Exhs. 7, 12*; *Defendant's Exh. 8*.  In short, these
expenditures were consistent with both parties' descriptions of business operations, and consequently, represent
the ordinary costs that arose in the course of operating those businesses.

comes or may come into conflict with his duty to the beneficiaries"). Similarly, the expenditures

identified in category (iii) were consistent with the testimony offered at trial regarding the expenses

Sorbera incurred while operating Retro Marine. Each time Sorbera sold a boat for Retro Marine,

Sorbera drove from Massachusetts to Canada, then from Canada to Florida, and then from Florida to the

buyer's location, the Outer Banks of North Carolina for instance. The wisdom of such a business plan is

not at issue; what is at issue is whether Sorbera committed a defalcation by writing checks to himself to

recover the costs of carrying out that plan. I find that he did not. The uncontroverted testimony at trial

established that Sorbera used his personal credit card to cover the considerable travel expenses he

incurred on behalf of Retro Marine. I find that Sorbera's reimbursements were made in accordance with

the parties' agreement for business purposes and thus did not constitute defalcations. *Id.* at 17 ("[I]f

there is no breach, there is no defalcation.").

The loan repayments present a closer question. Sorbera withdrew moneys from Retro Marine

and Fish World to repay himself for the loans that he made to the parties' joint ventures. Morrissette

characterizes this as self-dealing. I disagree. Although Sorbera had a personal interest in seeking

repayment, the amount that he withdrew for that purpose—approximately $69,000 of the $326,700

that he lent—was not in excess of the return that Morrissette received on his own investment, which

involved a significantly smaller loan. Morrissette, who loaned the companies $200,000, received at least

$69,000—in addition to taking title to the Angelea Road property. Therefore, I find that Sorbera's

conduct was entirely consistent with the parties' business plan and cannot reasonably be construed as

favoring himself over Morrissette.

*Baylis* next directs me to consider whether Sorbera's actions were "so egregious that they come

close to the level that would be required to prove fraud, embezzlement, or larceny." *In re Baylis*, 313

F.3d at 20. As previously explained in the § 523(a)(2) analysis, the evidence presented was insufficient

to place Sorbera's conduct within the realm of fraud. Furthermore, because Sorbera's role within the

11

companies entitled him to access the funds, the level of fault implicated by the loan repayments does

not come close to fitting the mold of larceny.  *See McCallion v. Lane (In re Lane)*, 936 F.2d 694, 697 n.6

(1st Cir. 1991) (quoting *In re Graziano*, 35 B.R. 589, 594 (Bankr. E.D.N.Y. 1983) for the proposition that

larceny entails "the taking of *another's* property without consent of the *owner*"). Finally, embezzlement

requires that there be some evidence that the property was used for an unauthorized purpose. *See*

*Sherman v. Potapov (In re Sherman)*, 603 F.3d 11, 13 (1st Cir. 2010) (noting that embezzlement requires

"knowledge that the use is devoid of authorization"). Such a purpose was absent from this case, as the

terms of the parties' oral agreement were such that both parties were authorized to withdraw company

funds to repay the loans they had made to the companies.  Morrissette himself took advantage of this

arrangement by selling the Retro Development property and pocketing the $49,000 in proceeds.

Sorbera, who made far more substantial loans to the companies, was likewise entitled to seek

repayment.  Therefore, I find that the loan repayments themselves were not so egregious as to

constitute defalcation.

Moreover, even if I were to find that Sorbera did commit a defalcation by repaying a portion of

his loans, Morrissette would be "estopped from challenging [Sorbera's] conduct in view of his own

similar conduct." *In re Romano*, 353 B.R. at 770.  "It is old hat that a court called upon to do equity

should always consider whether the petitioning party has acted in bad faith or with unclean hands."

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 880 (1st Cir. 1995).  I find that

Morrissette's own secret and unauthorized actions with respect to the parties' joint ventures—

particularly the $125,000 withdrawal of equity and concomitant mortgaging of the Oakwood property—

prompted Sorbera's independent acceleration of his own repayment schedule.  Because Morrissette's

"misconduct is directly related to the merits of the controversy between the parties," the doctrine of

unclean hands bars his claim as to the nondischargeability of Morrissette's loan repayments. *Texaco*, 60

F.3d at 880.  Consequently, I find that Morrissette has not proven by a preponderance of the evidence

that Sorbera committed a defalcation while acting in a fiduciary capacity within the meaning of §

523(a)(4).

**IV. Conclusion**

      For the reasons set forth above, the Court finds that Morrissette has failed to sustain his burden

for establishing cause for exception to discharge under § 523(a)(2)(A) or (a)(4).  By separate order, the

Court will dismiss his complaint with prejudice.

Date:  December 10, 2012

                             Frank J. Bailey
                             United States Bankruptcy Judge